**FILED**

AUG - 3 2009

Clerk, U.S. District and
Bankruptcy Courts

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, <br>   c/o The United States Department of Justice <br>   601 D Street N.W., Room 9126 <br>   Washington, D.C. 20004, <br><br>         Plaintiff, <br><br>         v. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CV No. _____ <br><br> COMPLAINT OF THE UNITED <br> STATES OF AMERICA |

| | | |
|---|---|---|
| FIRST CHOICE ARMOR & EQUIPMENT, INC., <br>   50 Braintree Hill Office Park, Suite 103 <br>   Braintree, Massachusetts 02184, <br><br> EDWARD DOVNER, <br>   835 Estuary Way <br>   Del Ray Beach, Florida 33483, <br><br> KAREN HERMAN, <br>   835 Estuary Way <br>   Del Ray Beach, Florida 33483, <br><br> EXOTIC CARS LLC, <br>   c/o Edward Dovner, <br>   835 Estuary Way <br>   Del Ray Beach, Florida 33483, <br><br> EXCEL AVIATION, LLC, <br>   c/o Edward Dovner, <br>   35 Braintree Hill Office Park, Suite 204 <br>   Braintree, Massachusetts 02184, and <br><br> MRSA JETS, LLC <br>   c/o Excel Aviation, LLC <br>   35 Braintree Hill Office Park, Suite 204 <br>   Braintree, Massachusetts 02184, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | 1. VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A); <br> 2. VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B); <br> 3. BREACH OF CONTRACT; <br> 4. PAYMENT BY MISTAKE; <br> 5. UNJUST ENRICHMENT; <br> 6. FRAUDULENT CONVEYANCES 28 U.S.C. § 3304(a)(1); <br> 7. FRAUDULENT CONVEYANCES 28 U.S.C. § 3304(b)(1)(A); and <br> 8. FRAUDULENT CONVEYANCES 28 U.S.C. § 3304(b)(1)(B) <br><br> RELATED CASES:    CV No. 04-0280 RWR, <br>                    CV No. 07-1144 RWR, <br>                    CV No. 08-961 RWR <br><br><br> Case: 1:09-cv-01458 <br> Assigned To : Roberts, Richard W. <br> Assign. Date : 8/3/2009 <br> Description: General Civil |

Plaintiff, the United States of America, alleges as follows:

**OVERVIEW**

1.      This is an action brought by the United States to recover damages and civil

penalties under the False Claims Act (FCA). 31 U.S.C. §§ 3729-33. and to recover damages for

breach of contract. payment by mistake. and unjust enrichment.  All of these claims are premised

upon the conduct of the Defendants First Choice Armor & Equipment. Inc. (First Choice). and

one of its principals. Edward Dovner. in submitting or causing to be submitted false claims for

payment and making or causing to be made false statements in connection with the sale of

defective Zylon body armor, primarily ballistic bullet-proof vests. to the United States and to

state. local. and tribal law enforcement agencies funded in part by federal funds.

2.      The United States alleges that Zylon body armor contained fabrics woven of

Zylon fiber which was manufactured by Toyobo Co. Ltd. and Toyobo America. Inc. (collectively

Toyobo).  The First Choice vests contained unique laminated woven Zylon that utilized a heat-

sealing process in which the Zylon was exposed to heat as part of the lamination process.  These

defective Zylon vests were sold to the United States and state. local. and tribal authorities by

First Choice.  The United States alleges that First Choice and Dovner knew. within the meaning

of the FCA. that the Zylon bullet-proof vests First Choice sold were defective and degraded

more quickly than First Choice and Dovner represented.  Indeed, they had been told by Cheung

Lie Ting (Ting). the ISO 9000 quality specialist[1] for Lincoln Fabrcis Ltd. (First Choice's weaver

who turned Zylon fiber into fabric for use in the First Choice body armor) to add more layers of

ballistic resistant materials to improve the safety margin of their Zylon vests.  But First Choice

---

[1] The ISO 9000 Standards are a set of guidelines created by the International
Organization for Standardization that assure that businesses meet certain quality control and
management standards.

and Dovner ignored this warning, failed to add any more protective layers, and continued to market their Zylon vests as suitable for ballistic protection and as the thinnest and lightest vests available on the market. As a result of First Choice and Dovner's conduct and representations, the United States paid for defective Zylon body armor. The United States also seeks damages for breach of contract and payment by mistake against First Choice and unjust enrichment against First Choice, Dovner and Defendant Karen Herman (Herman), the President of First Choice. Additionally, the United States seeks to recover damages from First Choice, Dovner, and Herman for their roles in removing and retaining assets from First Choice following notice of the United States' investigation of First Choice for violations of the False Claims Act. These transfers rendered First Choice insolvent and unable to repay the United States for the fraudulently obtained funds.

## JURISDICTION

3.      This Court has jurisdiction over this action pursuant 28 U.S.C. §§ 1345 and 1331. The Defendants are doing and/or previously did business within this District. Specifically, a minimum of 360 Zylon vests manufactured by First Choice were delivered to or invoiced to the United States Government in this District. Additionally, the claims for payment for all First Choice Zylon vests -- over 5,770 Zylon vests -- purchased under the Bullet Proof Vest Grant Partnership Act (BPVGPA) were submitted to the Office of Justice Programs (OJP) of the Department of Justice which is located within this District.

4.      Venue is proper within this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a). The Defendants are doing and/or previously did business within this District.

3

**PARTIES**

**The United States of America**

5.      The plaintiff is the United States of America.  The United States brings this

lawsuit on behalf of its agencies, including, but not limited to, the Department of Justice (DOJ),

the General Services Administration (GSA), the Department of Defense (DoD), the Treasury

Department, the Department of Homeland Security (DHS), the Department of the Interior

including, but not limited to, the United States Park Police (Park Police), and all other federal

agencies or divisions which purchased, or provided funds for the purchase of, ballistic vests

made in whole or in part with Zylon manufactured by Toyobo.

**The Defendants**

6.      Defendant First Choice Armor, Inc. is a Massachusetts corporation doing business

in this District.  First Choice's last known business address is 50 Braintree Hill Office Park,

Suite 103, Braintree, Massachusetts, 02184.  First Choice also has a manufacturing facility

located at 209 Yelton Street, Spindale, North Carolina, 28160.  First Choice has signed multiple

tolling agreements as to the statute of limitations with the United States and its current tolling

agreement expires on August 4, 2009.

7.      Defendant Edward Dovner is an individual who resides in the state of Florida.

His last known address is 835 Estuary Way, Del Ray Beach, Florida  33483.  Dovner also owns

another residence in Ashville, North Carolina.  Dovner is the founder of First Choice and the

United States alleges that Dovner runs First Choice's business.  Dovner is married to Defendant

4

Karen Herman.  Dovner has signed multiple tolling agreements as to the statute of limitations with the United States and his current tolling agreement expires on August 4, 2009.

8.      Defendant Karen Herman is an individual who resides in the state of North Carolina. Her last known address is 835 Estuary Way, Del Ray Beach, Florida 33483.  Herman also owns another residence in Ashville, North Carolina.  Herman is married to  Dovner. Herman is the sole shareholder and the named President of First Choice; however, she does not run the company on a daily basis. Rather, as Dovner admitted, Herman is listed as the President of First Choice in order to take advantage of minority and women-run business set-asides.  Herman was actively involved in the marketing of Zylon vests.  Herman has signed multiple tolling agreements as to the statute of limitations with the United States and her current tolling agreement expires on August 4, 2009.

9.      Defendant Exotic Cars LLC, is a Florida limited liability corporation, whose sole officer is Defendant Dovner.  Exotic Cars' last known address is c/o Edward Dovner, 835 Estuary Way, Del Ray Beach, Florida 33483. The United States is informed and believes, and on that basis alleges, that Exotic Cars owns at least two motor vehicles, including, but not limited to, a Ferrari and a Maserati, purchased by Dovner with funds from First Choice after he had notice of the United States' investigation of First Choice.  For the reasons set forth below, the United States is informed and believes, and on that basis alleges, that Exotic Cars is the alter ego of Dovner.

10.     Defendant Excel Aviation, LLC is a Massachusetts limited liability corporation, whose sole officer is Defendant Dovner.  Excel Aviation's last known address is c/o Edward Dovner, 35 Braintree Hill Office Park, Suite 204, Braintree, Massachusetts 02184.  The United

States is informed and believes, and on that basis alleges, that Excel Aviation owns a private jet aircraft purchased by Defendant Dovner with funds from First Choice after he had notice of the United States' investigation of First Choice. For the reasons set forth below, the United States is informed and believes, and on that basis alleges, that Excel Aviation is the alter ego of Dovner.

11.     Defendant MRSA Jets, LLC is a Massachusetts limited liability corporation, whose sole officer is Defendant Excel Aviation. Defendant Dovner, in turn, is the sole officer of Excel Aviation. MRSA Jets' last known address is c/o Excel Aviation, LLC, 35 Braintree Hill Office Park, Suite 204, Braintree, Massachusetts 02184. The United States is informed and believes, and on that basis alleges, that MRSA Jets owns a private jet aircraft purchased by Defendant Dovner with funds from First Choice after he had notice of the United States' investigation of First Choice. For the reasons set forth below, the United States is informed and believes, and on that basis alleges, that MRSA Jets is the alter ego of Dovner.

**Alter Ego Relationships**

12.     Defendant Dovner is liable in this action for the conduct of his various corporations, partnership, and LLCs which were acting as his alter egos. Dovner, through his agent Philip Esformes, created separate legal entities, generally subchapter S corporations, limited partnerships, limited liability corporations (LLCs), and fictitious business names, for companies which took possession of assets that Dovner purchased with funds removed from First Choice after Dovner and First Choice had notice of the United States' investigation of First Choice. Dovner owned or controlled these entities, including, but not limited to, Defendants Exotic Cars, Excel Aviation, and MRSA Jets. Dovner is the sole officer of Exotic Cars and Excel Aviation, and Excel Aviation is the sole officer of MRSA Jets. The United States

6

anticipates that a reasonable opportunity for further investigation and discovery will establish

that the purpose of the existence of these corporate entities was to insulate Dovner from potential

liability and to hide his ownership of a Ferrari, a Maserati, and a private jet aircraft.

## BACKGROUND

### A.    The False Claims Act

13.    The United States' claim for submitting or causing to be submitted false claims to

the United States is governed by the FCA, which provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be
> presented, to an officer or employee of the United States
> Government or a member of the Armed Forces of the United States
> a false or fraudulent claim for payment or approval;
>
>                              * * *
> is liable to the United States Government . . . .
>
> (b) For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person, with respect to information (1)
> has actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required.

31 U.S.C. § 3729.

14.    Pursuant to the Fraud Enforcement and Recovery Act of 2009 (FERA), PL

111-21 (May 18, 2009), the United States' claim for making or causing to be made false

statements or records is governed by 31 U.S.C. § 3729(a)(1)(B), which provides, in part, that:

> [A]ny person who-- . . . (B) knowingly makes, uses, or causes to be made or used,
> a false record or statement material to a false or fraudulent claim; . . . is liable to
> the United States Government for a civil penalty of not less than $5,000 and not
> more than $10,000 . . .., plus 3 times the amount of damages which the
> Government sustains because of the act of that person.

31 U.S.C. § 3729 (a)(1)(B).

**B.     The GSA Program**

15.     The General Services Administration (GSA) is an agency of the federal

government with the responsibility for administration of the Multiple Award Schedule (MAS)

contracting program (also known as the Federal Supply Schedule (FSS)).

16.     Under the MAS program, GSA negotiates contracts for commonly used

commercial off-the-shelf items with contractors.  Federal agencies can then purchase products

under MAS contracts directly from contractors at pre-negotiated prices, terms and conditions.

Products are grouped under pre-designated Special Item Numbers (SINs) which connote broad

categories of commercial products or services.

17.     The GSA Schedule included Zylon bullet-proof vests from First Choice.  From

approximately 1999 to 2005, the United States Government purchased more than 1,300 Zylon

bullet-proof vests from First Choice.  The United States paid more than $1.37 million for these

Zylon vests purchased from the GSA schedule.  All of these vests carried a five-year warranty.

The claims for payment for each and every First Choice Zylon vest sold to the United States

under the GSA schedule by First Choice were false claims in that the Zylon in those vests was

defective and degraded substantially and quickly and, thus, did not meet their five-year warranty.

By the actions set forth in Paragraphs 25-49 of this Complaint, First Choice and Dovner knew

that the Zylon in these vests was defective and degraded substantially and quickly and did not

comply with their five-year warranty.  Notwithstanding this knowledge, First Choice and Dovner

misrepresented the suitability of Zylon in ballistic applications.  For these reasons, First Choice

and Dovner knowingly presented or caused false claims to be presented to the federal

government and knowingly made or caused to be made false statements to get false claims paid.

8

18.     The federal agencies that paid for these First Choice Zylon vests listed on the GSA schedule would not have paid for these vests if they had known that the Zylon in the vests degraded much more rapidly than disclosed by First Choice and Dovner and would not meet their five-year warranty.

## C.     The Bullet Proof Vest Grant Partnership Act Program

19.     In late 1997, after two state troopers without bullet-proof vests were killed in shootings, Congress created a grant program called the Bullet Proof Vest Grant Partnership Act (BPVGPA), 42 U.S.C. § 3796ll, *et seq.* Under the BPVGPA, the United States reimburses eligible state, local, and tribal authorities for up to fifty percent of the cost of ballistic vests. The exact amount state, local, and tribal law enforcement agencies are reimbursed for any specific vest depends on the entitlement cap for each such agency for that fiscal year. The BPVGPA grant program is administered by the OJP.

20.     Purchasers under the BPVGPA grant program cannot be reimbursed until they certify to OJP that they have paid for and received the vests. State, local, and tribal authorities do not receive funds from the BPVGPA in advance of their purchases or in advance of their receipt of the vests.

21.     From fiscal year 2000 to fiscal year 2005, First Choice sold a minimum of 5,773 Zylon vests to state, local, and tribal law enforcement entities under the BPVGPA. The federal government reimbursed these state, local, and tribal law enforcement agencies at least $1.1 million for these First Choice Zylon vests under the BPVGPA. The claims for payment for each and every First Choice Zylon vest presented to the United States by state, local, and tribal law enforcement agencies pursuant to the BPVGPA were false claims in that the Zylon in those vests

9

was defective and degraded substantially and quickly and, thus, did not meet their five-year warranty. By the actions set forth in Paragraphs 25-48 of this Complaint, First Choice and Dovner knew that the Zylon in these vests was defective and degraded substantially and quickly and would not meet their five-year warranty. For these reasons, First Choice and Dovner knowingly caused false claims to be presented to the federal government.

22.     The United States would not have reimbursed the claims for payment for the First Choice Zylon vests under the BPVGPA Program if it had they known that the Zylon in the vests was degrading more rapidly than disclosed by First Choice and Dovner and was a defective product.

**D.     Other Federal Purchases**

23.     Other federal agencies purchased Zylon bullet-proof vests directly from First Choice or from their distributors pursuant to federal contracts, other than through the GSA Schedule. From approximately 2000 through 2005, the federal government purchased Zylon bullet-proof vests from First Choice. The claims for payment for each and every First Choice Zylon vest sold to the United States under federal contracts by First Choice were false claims in that the Zylon in those vests was defective and degraded substantially and quickly and, thus, did not meet their five-year warranty. By the actions set forth in Paragraphs 25-48 of this Complaint, First Choice and Dovner knew that the Zylon in these vests was defective and degraded substantially and quickly and did not meet their five-year warranty. For these reasons, First Choice and Dovner knowingly caused false claims to be presented to the federal government.

24.     The United States would not have paid for the First Choice Zylon vests if it had

known that Zylon in these vests was degrading more rapidly than disclosed by First Choice and Dovner and was a defective product.

## THE FIRST CHOICE SCHEME

### A.    Violations of the False Claims Act

25.    First Choice manufactured and sold Zylon vests beginning in early 2000 and continuing through August 2005. First Choice did not employ or retain any engineers, chemists or polymer experts, but nevertheless marketed the Zylon vests as suitable for law-enforcement use.

26.    The United States is informed and believes and on that basis alleges that, in or about 1999, Dovner discussed the possibility with Lincoln that Lincoln would weave Zylon for use in First Choice's body armor. Shortly thereafter, Lincoln became the weaver for First Choice and thereafter Ting, as the ISO 9000 quality specialist at Lincoln, would receive calls from Dovner and others at First Choice seeking advice about First Choice Zylon body armor. Indeed, Ting was identified by Dovner as his chief source of technical advice concerning Zylon.

27.    In or about October 2000, representatives of Toyobo, Itochu International, Inc. (Toyobo's trading company that imported Zylon fiber into the United States) (Itochu), and First Choice, including Dovner, met to discuss the use of Zylon in First Choice vests.

28.    In or about December 2000, Lincoln, Itochu, and Toyobo agreed to supply First Choice and Dovner with Zylon fabric at no cost so that First Choice and Dovner could obtain initial certification of the Zylon vests by the National Institute of Justice.

29.    From 2000 to 2005, First Choice's marketing emphasized thin and lightweight Zylon vests as a critical element of its sales pitch to the United States' body armor market.

11

30.     From 2000 to 2005. First Choice issued a five-year warranty on the Zylon vests.

First Choice did not perform any testing to determine whether a five-year warranty was

appropriate. First Choice offered this warranty because other companies in the industry did so

and they needed to do so to compete. The First Choice warranties expressly stated "[t]he

ballistic panels contained within your vest are under warranty for a period of five years to

provide the protection as stated on the panels."

31.     From 2000 to 2005. First Choice utilized a special heat sealing process that

exposed Zylon fibers to heat and bonded them together. The United States alleges that this

exposure to heat accelerated the Zylon degradation process so that a layer of First Choice's

Zylon was weaker than a comparable Zylon layer from other vest manufacturers.

32.     To the extent that First Choice regular performed ballistics testing, it routinely

heated the clay backing above room temperature levels which reduced the likelihood of

penetrations. Dovner and First Choice employees knew that the impact of heating the clay

backing would be to make penetrations less likely.

33.     Beginning in 2001. First Choice and Dovner received correspondence from

Toyobo, the Zylon fiber manufacturer, about Zylon degradation. (This correspondence

constituted only a small portion of the information concerning Zylon degradation in Toyobo's

possession. Toyobo's misconduct is the subject of a separate lawsuit entitled. United States v.

Toyobo Co., Ltd., et al. (D.D.C. No. 07-1144)). This data highlighted problems with Zylon

degradation due to age, light, heat, and humidity.

34.     In or about July 2001. DSM, a Dutch company, which manufactured a Zylon

laminate product for ballistic applications, issued an "URGENT URGENT URGENT URGENT"

announcement that it had "serious indications that the use of PBO-fiber in bullet-resistant vests may not be justified." DSM concluded that "[b]ecause of the serious nature of these indications DSM HPF decided to put on hold the market introduction of its PBO-fiber containing product offered to you as Zylon UD-SB10." The United States alleges that, by at least July 6, 2001, First Choice and Dovner were aware of the DSM announcement.

35.    On the same day as the DSM announcement, Toyobo informed First Choice and Dovner that it had been doing accelerated aging testing on Zylon and announced that "the strength of Zylon decreases under high temperature and humidity conditions." At that time, Toyobo estimated that Zylon would lose five percent of its tensile strength in ten years at normal conditions. Toyobo also informed First Choice and Dovner about the DSM announcement. Despite its own July 2001 data which showed a loss of Zylon strength at high temperature and high humidity, Toyobo falsely claimed "we have not found any serious indication from our test using Zylon fiber up to now."

36.    By August 2001, First Choice and Dovner were aware that the Zylon degradation problem was worse that Toyobo had first indicated. On or about August 28, 2001, Toyobo informed First Choice and Dovner that its July 2001 estimate of a five percent tensile strength loss in ten years was not accurate. Toyobo informed First Choice that it "found out a little bigger strength drop than we expected" at 40°C (104°F) and 80% humidity: 5% at 10 days, 7.5% at 100 days (over 3 months), and 10% at 1000 days (less than 3 years).

37.    In the Fall of 2001, First Choice sought guidance from Ting about the Toyobo degradation data. Ting warned Dovner and First Choice that this data showed the safety margins in First Choice's Zylon vests were eroding and recommended that First Choice more add layers

13

of ballistic resistant materials to compensate for the Zylon degradation. Ting repeated these warnings to Dovner several times over the course of their dealings.

38.     On or about November 26, 2001, Toyobo sent Zylon degradation data to First Choice and Dovner which revealed a dramatic drop in Zylon's tensile strength when it was exposed to 40°C and 70-80% humidity. Dovner asked Ting about this data and Ting explained to Dovner the data's significance in terms of Zylon degradation. Ting informed Dovner at or about the time of the November 2001 data that Ting understood based on his review of scholarly publications that there was approximately a 2:1 ratio between tensile strength and ballistic performance (i.e., a 20% loss in tensile strength would result in a 10% loss in ballistic performance).

39.     In January 2002, Toyobo informed First Choice and Dovner that it had withdrawn its November data regarding Zylon degradation on the ground it was "statistically not correct and not reliable." At this time, First Choice and Dovner could no longer continue to rely in good faith on Toyobo's Zylon degradation data. The best case scenario was that Toyobo's previously announced data was "statistically not correct and not reliable." The worst case was that Toyobo was simply deleting the bad data.

40.     In or about April 2002, Jody Eberhardt, First Choice's national sales director, warned Dovner and First Choice about the excessive thinness of two First Choice Zylon vest models. Eberhardt refused to sell two First Choice 100% Zylon models – MSF and MSFF – because he believed that they were too thin. Disregarding Eberhardt's warnings, First Choice continued to market these vests until April 2004.

41.     On or about March 21, 2003, Doug Van der Pool, First Choice's Vice President of

14

sales, wrote an email to Dovner in which Van der Pool stated "you and I KNOW that heat does

affect laminated Zylon and that if it comes officially from NIJ AHI [Armor Holdings - another

vest manufacturer] will have to do a recall that could very well bankrupt their a**. I don't want

to be in the same situation so I guess what I am saying is that I would not take any of this lightly

.... our distributors and cops don't." (emphasis in original; expletives deleted).   Additionally,

Van der Pool warned Dovner that "if they (NIJ) make a statement like 'we have determined that

long term exposure to heat/humidity can be detrimental to the ballistic integrity of Zylon' you're

f*****." (expletives deleted).

    42.    In June 2003, Officer Tony Zeppetella of Oceanside, California and Officer Ed

Limbacher of Forest Hills, PA were shot through their 100% Zylon ballistic vests.  Their vests

were manufactured by Second Chance Body Armor, Inc., another Zylon vest manufacturer.

These Zylon vests were less than one year old.

    43.    By at least August 2003, First Choice and Dovner were aware of the Second

Chance Zylon vest failures.  On or about August 12, 2003, First Choice issued a press release

claiming that its vests were different from that of the competition (i.e., Second Chance) and were

thicker and had higher ariel density that the competition's vests.  These statements were contrary

to First Choice's prior marketing of its Zylon vests as thinner and lighter than its competition's

Zylon vests.  In this press release, First Choice also stated "we believe our production processes

ensure that our products will perform as intended."  The United States alleges that, at the time of

this statement, First Choice had performed no testing to support it.

    44.    On or about September 10, 2003, Van der Pool again reported to Dovner that

other manufacturers were re-engineering their Zylon products to compensate for the Zylon

degradation. First Choice and Dovner took no steps to modify First Choice's Zylon vest designs despite their knowledge of Zylon degradation and Ting's warnings to add more layers of ballistic-resistant materials to the First Choice Zylon vests.

45. In or about October 10, 2003, Toyobo disclosed to First Choice and Dovner that it had conducted fiber strength tests on fiber removed from woven Zylon fabric beginning in 2001 that showed a greater and more serious degradation than Toyobo's previously published data of raw Zylon fiber. (This information was significant because Toyobo had previously disclosed only testing performed on raw Zylon fiber, not fiber removed from woven Zylon fabric, which was closer to the condition of Zylon fiber in Zylon vests.) Despite knowing that Toyobo had misrepresented much of the data it provided to First Choice and Dovner from July 2001 to September 2003, First Choice and Dovner continued to sell Zylon vests to the United States Government and to state, local, and tribal law enforcement officers until August 25, 2005.

46. On or about April 2, 2004, First Choice and Dovner decided to discontinue the sales of First Choice's 100% Zylon vests because of the "horrible press" regarding all Zylon vests.

47. From April 2004 to August 25, 2005, First Choice and Dovner continued to sell other First Choice Zylon vests to the United States Government and to state, local, and tribal law enforcement agencies.

48. In August 2005, the National Institute of Justice (NIJ) tested eight First Choice vests and they all failed (four failed due to bullet penetrations and four failed due to excessive

back face deformation).[2]

## B.    Fraudulent Conveyances

49.    On or about March 27, 2006, a General Services Administration Office of Inspector General subpoena was served on First Choice. First Choice was aware of the subpoena no later than on or about April 1, 2006.

50.    Notwithstanding this notice of investigation, First Choice made substantial distributions to Herman during the period of the United States' investigation. These distributions to Herman were higher than the tax liability owed for each particular year and as such, would constitute fraudulent conveyances. Beginning in 2006 and continuing through 2008, Dovner and Herman removed more than $5 million from First Choice in excess of any tax liability Herman owed as the sole shareholder of First Choice. Prior to notice of the United States' investigation, in or about 2005, First Choice made a distribution to Herman of about $744,699. After notice of the United States' investigation, in or about 2006, First Choice made a much larger distribution to Herman of $5,840,633, which the United States is informed and believes, and on that basis alleges, that this distribution exceeded any tax liability of Herman as the sole shareholder of First Choice. In or about 2007, First Choice made a distribution to Herman of $4,047,424, which the United States is informed and believes, and on that basis alleges, that this distribution also exceeded any federal income tax liability that Herman would have had for First Choice, a subchapter S corporation, which declared a loss for 2007. As a result of these transfers from First Choice to Dovner and Herman, First Choice became

_____

[2] Back face deformation is the effect of a non penetrating projectile on the rear face of a strike plate. Excessive deformation can lead to serious injuries at the site of impact, even open wounds, even though no bullet perforated the vest.

insolvent. In or about 2008, Herman made a capital contribution to First Choice in the amount of $1,160,190. The United States is informed and believes, and on that basis alleges, that Herman's capital contribution was insufficient to restore First Choice to solvency and First Choice remains insolvent.

51.     In or about May 1, 2006, Dovner purchased a 2003 Ferrari Marinello (Ferrari). The Ferrari had been purchased from a dealer in New York by The Truck Store, a seller of used commercial trucks located in Rayham, Massachussetts operated by Michael Dovner, whom the United States is informed and believes, and on that basis alleges, is Dovner's relative. The United States is informed and believes, and on that basis alleges, that on or about May 16, 2006, Dovner registered the car in his name in the state of Massachussetts. The United States is informed and believes, and on that basis alleges, that on or about December 27, 2006, Dovner re-registered the Ferrari in Florida as a personal vehicle.

52.     On or about May 2, 2006, on information and belief, the United States alleges that Dovner purchased a 2006 Maserati Quatropro M319 (Maserati). The United States is informed and believes, and on that basis alleges, that on or about May 2, 2006, Dovner registered the Maserati in the state of Massachussetts as a personal vehicle. The United States is informed and believes, and on that basis alleges, that on or about May 16, 2007, Dovner re-registered the Maserati in the state of North Carolina. The United States is informed and believes, and on that basis alleges, that on or about December 14, 2007, Dovner re-registered the Maserati in the state of Florida.

53.     On or about April 11, 2006, Dovner incorporated Exotic Cars LLC, a Florida limited liability corporation. Dovner is the sole officer and manager of Exotic Cars LLC. The

United States is informed and believes. and on that basis alleges. that Exotic Cars LLC owns the

Ferrari and the Maserati. Exotic Cars LLC is the alter ego of Dovner.

54.     On or about October 18. 2006. MRSA Jets LLC (MRSA) registered a 1998

Raytheon 400A jet aircraft (serial no. RK-198) with tail no. N400TE. MRSA is a Massachusetts

limited liability company. The manager of MRSA is Excel Aviation. Inc. (Excel). a

Massachusetts corporation. The sole officer of Excel Aviation, Inc. is Dovner. The United

States is informed and believes that MRSA and Excel own the jet aircraft. MRSA and Excel are

alter egos of Dovner.

55.     The United States is informed and believes. and on that basis alleges. that

Defendants Dovner and Herman used the funds transferred to them by First Choice to purchase

the Ferrari. the Maserati, and the private jet plane.

## COUNT 1

## VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)
## AGAINST FIRST CHOICE AND DOVNER

56.     The United States re-alleges and incorporates herein by reference paragraphs 1

through 48.

57.     First Choice and Dovner knowingly presented or caused to be presented false or

fraudulent claims to the United States for payment for Zylon bullet proof vests sold to federal

agencies which First Choice and Dovner knew. recklessly disregarded or deliberately ignored

were defective. in violation of the FCA. 31 U.S.C. § 3729 (a)(1)(A).  Additionally. First Choice

and Dovner presented or caused to be presented by state, local, and tribal law enforcement

agencies false claims for payment under the BPVGPA for Zylon ballistic vests which First

Choice and Dovner knew were defective.  These First Choice vests were defective and did not

meet their five-year warranties. First Choice and Dovner knew the Zylon vests were defective

based on conversations with Ting. Eberhardt and Van Der Poole. as set forth *supra* at ¶¶ 25-48.

Yet, First Choice and Dovner ignored these warnings. failed to add any more ballistic resistant

layers to the First Choice Zylon vests. and continued to market these Zylon vests as suitable for

ballistic protection and as the thinnest and lightest vests available on the market. As a result of

this misconduct, the United States paid for defective Zylon body armor. Each and every claim

for payment for any Zylon vest presented to the United States was false. All of these claims

were knowingly false claims under the FCA.

58.      By virtue of these false or fraudulent claims. the United States suffered damages

in an amount to be determined at trial.

**COUNT 2**
**VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)**
**AGAINST FIRST CHOICE AND DOVNER**

59.      The United States re-alleges and incorporates herein by reference paragraphs 1

through 48.

60.      First Choice and Dovner knowingly made or caused to be made false statements

and false records material to false claims for Zylon vests that were purchased by various

agencies wit federal funds. In so doing. First Choice and Dovner knew, recklessly disregarded.

or were  deliberately indifferent to the defective nature of these vests. in violation of the FCA. 31

U.S.C. § 3729(a)(1)(B). Additionally, First Choice and Dovner made or caused to be made false

statements and records in connection with false claims for payment made by state, local. and

tribal law enforcement agencies under the BPVGPA for Zylon vests which First Choice and

Dovner knew. recklessly disregarded. or deliberately ignored were defective. These First Choice

20

vests were defective in that they were degrading more quickly than disclosed by First Choice and Dovner and they did not meet their five-year warranties. First Choice and Dovner knew the Zylon vests were defective based on conversations with Ting. Eberhardt and Van der Pool. as set forth *supra* at ¶¶ 25-48. Yet. First Choice and Dovner ignored these warnings. failed to add any more ballistic resistant layers to the First Choice Zylon vests. and continued to market these Zylon vests as suitable for ballistic protection and as the thinnest and lightest vests available on the market.

61.     By virtue of these false statements and records. the United States suffered damages in an amount to be determined at trial.

## COUNT 3

### BREACH OF CONTRACT
### AGAINST FIRST CHOICE

62.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 48.

63.     First Choice entered into contracts with the United States. including but not limited to the GSA contract and direct contracts with other federal agencies. These contracts imposed obligations on First Choice. including. but not limited to. a five-year warranty on the Zylon bullet proof vests provided to the United States under these contracts.

64.     First Choice breached its contractual obligations (including its warranty) to:  a) provide Zylon bullet proof vests that were free of all defects in material and workmanship; b) comply with the warranty requirements of these contracts; c) take adequate corrective action upon the discovery of the defects in the Zylon fabric; and d) adequately identify nonconforming material.

65.     By virtue of these breaches of its contractual obligations, the United States suffered damages in an amount to be determined at trial.

**COUNT 4**

**PAYMENT BY MISTAKE
AGAINST FIRST CHOICE**

66.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 48.

67.     For fiscal years 2000 – 2005, the United States made payments to Defendant First Choice in the erroneous belief that this Defendant was entitled to reimbursement, without knowing that Defendant's claims were made as part of a scheme to sell the United States defective bulletproof vests.  These payments included direct payments to First Choice under the GSA FAS schedule and the other federal purchases, as well as indirect payments to First Choice under the BPVGPA.

68.     The United States' erroneous beliefs were material to the amount of the payments made by the United States.

69.     Because of these mistakes of fact, this Defendant received funds to which it was not entitled.

70.      By reason of the overpayments, the United States is entitled to damages in an amount to be established at trial.

## COUNT 5

### UNJUST ENRICHMENT
### AGAINST FIRST CHOICE, DOVNER, AND HERMAN

71.    The United States re-alleges and incorporates herein by reference paragraphs 1

through 48.

72.    From 2000 to 2005, the United States paid First Choice for defective bulletproof

vests made of Zylon due to false statements and omissions by First Choice and Dovner and these

payments unjustly enriched First Choice, Dovner, and its owner, Herman.

73.    The United States is entitled to the return of all payments made by the United

States directly or indirectly to the body armor manufacturer for Zylon vests due to the false

claims presented for fiscal years 1998 to the present time.

74.    By reason of the above-described payments, First Choice, Dovner, and Herman

have received money, directly or indirectly, to which they were not entitled.  First Choice,

Dovner, and Herman therefore have been unjustly enriched in an amount to be established at

trial.

## COUNT 6

### FRAUDULENT CONVEYANCE UNDER THE FEDERAL
### DEBT COLLECTION PROCEDURES ACT, 28 U.S.C. § 3304(a)(1),
### AGAINST DEFENDANTS FIRST CHOICE, DOVNER, AND HERMAN

75.    The United States incorporates by reference the allegations contained in

paragraphs 1 to 55.

76.    At all times relevant to the allegations herein, First Choice owed the United States

a minimum of $2.3 million in single damages for the defective Zylon bullet-proof vests paid for

23

with federal funds.  This amount constitutes a "debt" under 28 U.S.C. § 3304(a)(1).

77.     Defendants First Choice, Dovner, and Herman caused funds, including over $5 million, to be taken and retained from the assets of First Choice.  Dovner then caused these funds to be used by Defendants Exotic Cars LLC, MRSA Jets LLC, and Excel Aviation, Inc., alter egos of Dovner, to purchase cars and a plane.  At the time of the Transfer, Defendants First Choice, Dovner, and Herman knew or should have known of the First Choice's outstanding debt to the United States.

78.     Defendants First Choice, Dovner, and Herman caused First Choice to convey approximately $5 million in funds to Dovner and Herman without obtaining reasonably equivalent value for that property, and, at the time of the Transfer, First Choice was insolvent or was rendered insolvent, in violation of 28 U.S.C. § 3304(a)(1).

79.     Due to the above-described acts of the Defendants, the United States has been injured in an amount to be established at trial.

### COUNT 7

### FRAUDULENT CONVEYANCE UNDER THE FEDERAL DEBT COLLECTION PROCEDURES ACT, 28 U.S.C. § 3304(b)(1)(A), AGAINST DEFENDANTS FIRST CHOICE, DOVNER, AND HERMAN

80.     The United States incorporates by reference the allegations contained in paragraphs 1 through 55.

81.     At all times relevant to the allegations herein, First Choice owed the United States a minimum of $2.3 million in single damages for the defective Zylon bullet-proof vests paid for with federal funds.  This amount constitutes a "debt" under 28 U.S.C. § 3304(a)(1).

82.     Defendants First Choice, Dovner, and Herman caused First Choice to convey over

$5 million in funds to Dovner and Herman with the actual intent to hinder, delay, and/or defraud the United States.  Dovner then caused these funds to be used by Defendants Exotic Cars LLC, MRSA Jets LLC, and Excel Aviation, Inc., alter egos of Dovner, to purchase cars and a plane.

83.    The actual intent to hinder, delay, and/or defraud the United States by Defendants First Choice, Dovner and Herman is demonstrated by the facts that: (a) at the time of the transfer, Defendants First Choice, Dovner, and Herman knew of the ongoing investigation of First Choice for fraud, knew the number of Zylon vests that had been sold to the United States, knew that Zylon body armor was a defective product, and knew that every First Choice vest tested (eight) had failed in the 2005 NIJ testing; (b) the Transfer was made to Dovner and Herman, insiders of First Choice within the meaning of 28 U.S.C. § 3301(5)(D); (c) the Transfer was made without receiving a reasonably equivalent value in exchange; (d) the Transfer was of all or substantially all of the assets of First Choice; (e) at the time of Transfer, First Choice was insolvent or rendered insolvent; and (f) other indicia of fraud were present.

84.    Due to the above-described acts of the Defendants, the United States has been injured in an amount to be established at trial.

## COUNT 8

### FRAUDULENT CONVEYANCE UNDER THE FEDERAL DEBT COLLECTION PROCEDURES ACT, 28 U.S.C. § 3304(b)(1)(B), AGAINST DEFENDANTS FIRST CHOICE, DOVNER, AND HERMAN

85.    The United States incorporates by reference the allegations contained in paragraphs 1 through 55.

86.    At all times relevant to the allegations herein, First Choice owed the United States a minimum of $2.3 million in single damages for the defective Zylon bullet-proof vests paid for

with federal funds.  This amount constitutes a "debt" under 28 U.S.C. § 3304(a)(1).

87.    Defendants First Choice. Dovner. and Herman caused First Choice to convey fraudulently funds. including more than $5 million. to Dovner and Herman without obtaining reasonably equivalent value for that property. and. at the time of the Transfer. First Choice was engaging in transactions for which the remainder of its assets were unreasonably small. or First Choice reasonably should have believed that it would incur debts beyond its ability to pay them. in violation of 28 U.S.C. § 3304(b)(1)(B)(I) & (ii).  Dovner then caused these funds to be used by Defendants Exotic Cars LLC. MRSA Jets LLC, and Excel Aviation. Inc., alter egos of Dovner. to purchase cars and a plane.

88.    Due to the above described acts of the Defendants. the United States has been injured in an amount to be established at trial.

**PRAYER FOR RELIEF**

**AS TO COUNT 1:**

As against Defendants First Choice and Dovner. judgment in an amount equal to:

1.    statutory damages in an amount to be established at trial;

2.    civil penalties for each false claim or false statement as provided by law;

3.    the cost of this action. plus interest. as provided by law; and

4.    any other relief that this Court deems appropriate.

**AS TO COUNT 2:**

As against Defendants First Choice and Dovner, judgment in an amount equal to:

1.    statutory damages in an amount to be established at trial;

2.    civil penalties for each false claim or false statement as provided by law:

3.    the cost of this action. plus interest. as provided by law; and

4.      any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

Against Defendant First Choice, judgment in an amount equal to:

1.      all damages caused by First Choice's breach of their contractual obligations in an amount to be established at trial;

2.      all reasonably foreseeable damages which flowed First Choice's breach of its contractual obligations in an amount to be established at trial;

3.      the cost of this action, plus interest, as provided by law; and

4.      any other relief that this Court deems appropriate.

**AS TO COUNT 4**

As against Defendant First Choice judgment in an amount equal to:

1.      the money paid by the United States to First Choice, plus interest;

2.      the cost of this action, plus interest, as provided by law; and

3.      any other relief that this Court deems appropriate.

**AS TO COUNT 5**

As against all Defendants judgment in an amount equal to:

1.      the money paid by the United States to, or received by, these Defendants directly or indirectly, plus interest;

2.      the cost of this action, plus interest, as provided by law; and

3.      any other relief that this Court deems appropriate.

**AS TO COUNT 6**

As against all Defendants judgment in an amount equal to:

1. The value of the property fraudulently transferred, plus interest from the date of Transfer;

2. a pre-judgment order of attachment, receivership, garnishment, and/or sequestration as requested by Plaintiff by separate application upon reasonable showing that Plaintiff has reasonable cause to believe that Defendants have or are about to assign, dispose, remove, conceal, ill treat, waste, destroy, convert property with the effect of hindering, delaying, or defrauding the United States;

3. the cost of this action, plus interest, as provided by law; and

4. any other relief that this Court deems appropriate.

**AS TO COUNT 7**

As against all Defendants judgment in an amount equal to:

1. the value of the property fraudulently transferred, plus interest from the date of Transfer;

2. a pre-judgment order of attachment, receivership, garnishment, and/or sequestration as requested by Plaintiff by separate application upon reasonable showing that Plaintiff has reasonable cause to believe that Defendants have or are about to assign, dispose, remove, conceal, ill treat, waste, destroy, convert property with the effect of hindering, delaying, or defrauding the United States;

3. the cost of this action, plus interest, as provided by law; and

4. any other relief that this Court deems appropriate.

**AS TO COUNT 8**

As against all Defendants judgment in an amount equal to:

1.    the value of the property fraudulently transferred, plus interest from the date of Transfer;

2.    a pre-judgment order of attachment, receivership, garnishment, and/or sequestration as requested by Plaintiff by separate application upon reasonable showing that Plaintiff has reasonable cause to believe that Defendants have or are about to assign, dispose, remove, conceal, ill treat, waste, destroy, convert property with the effect of hindering, delaying, or defrauding the United States;

3.    the cost of this action, plus interest, as provided by law; and

4.    any other relief that this Court deems appropriate.

Dated: August 3, 2009

TONY WEST
ASSISTANT ATTORNEY GENERAL

By: _____

By: _____

MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALICIA J. BENTLEY
CALLIE R. OWEN
A. THOMAS MORRIS
JENNIFER CHORPENING
ATTORNEYS
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

29                    NOT SEALED
                              - mvc
                              for jc

Tel:     202-616-9854
Fax:    202-514-0280